**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THOMAS LUCA JR., individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. 16-cv-746-MRH |
| v. | |
| WYNDHAM HOTEL GROUP, LLC, and WYNDHAM HOTELS AND RESORTS, LLC, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION PURSUANT TO FED. R. CIV. P. 23**

This case arises out of Defendants' practice of advertising certain hotel rooms on their websites at rates that are never honored.  Unlike typical hotel pricing, Defendants' hotels disguise their true prices by charging a separate and mandatory "resort fee," which is never included in the advertised rate, for rooms booked on Defendants' websites. Regardless of date, hotel, or the type of room selected, Plaintiff and the Class he seeks to represent were deceived into paying more than the advertised room rate. It made no difference whether the guest wanted any of the "resort fee amenities" that supposedly come with the fee. Notably, many of Defendants' other hotels provide similar amenities yet do not charge a resort fee. To make matters worse, the resort fees were obscured and suppressed by Defendants, hidden in hyperlinks or inconspicuous text away from the prominent room rates, and confusingly grouped with government-imposed taxes, making it difficult for guests to determine what the room prices really were.

This price segmentation practice, euphemistically referred to by some as "drip pricing," is in reality a quintessential "bait and switch," and it is illegal under the New Jersey Consumer

1

Fraud Act ("CFA"), N.J.S.A. §§ 56:8-1, *et seq.*[1] During the relevant period, Defendants' hotels

have collected millions of dollars using this scheme. Additionally, every person who booked a

room and paid a resort fee was required to agree to Defendants' website Terms of Use, which

contained terms prohibited by the New Jersey Truth–in-Consumer Contract, Warranty and

Notice Act ("TCCWNA"), N.J.S.A. §§ 56:12-14, *et seq.*

      Plaintiff Thomas Luca, Jr. seeks to certify an opt-out class under Rule 23(b)(3) of all

individuals in the United States who booked a room using Wyndham's websites, and paid more

than the advertised room rates as a result of Defendants' resort fees. As demonstrated below and

by the Expert Report of Vicki Morwitz, Ph.D., Plaintiff satisfies the requirements of Rule 23(a)

and (b)(3), and, accordingly, Plaintiffs' proposed class should be certified.

## I.   FACTUAL BACKGROUND

### A.   Defendants' Websites and Pricing Tactics

      Defendants and their subsidiaries own, manage, or license (via franchising) at least 5,500

hotel properties in the United States under a variety of brand names.[2] Collectively, all of these

hotels are hereinafter referred to as "Wyndham hotels" or "Wyndham-affiliated hotels." During

the relevant time period (June 6, 2010 to the present), ██████ Wyndham-affiliated

hotels have charged a mandatory add-on fee in addition to the advertised room rates, typically

---

[1] The Federal Trade Commission ("FTC") investigated whether certain hotel operators were violating Section 5 of the Federal Trade Commission Act, 15 U.S.C.§ 45(a), by misrepresenting the hotel room reservation price quoted to consumers and engaging in drip pricing. *See* https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be/121128hoteloperatorsletter.pdf. The FTC also released an economic analysis concluding that the charging of resort fees using drip pricing methods is likely to harm consumers by increasing the search costs and cognitive costs of finding and choosing hotel rooms. Mary W. Sullivan, Federal Trade Commission, *Economic Analysis of Hotel Resort Fees* (Jan. 2017), *available at* https://www.ftc.gov/system/files/documents/reports/economic-analysis-hotel-resort-fees/p115503_hotel_resort_fees_economic_issues_paper.pdf.

[2] **Ex. 1**, WYN00236993. (All bolded exhibit citations are to exhibits attached to the Declaration of Gary Lynch). The brands are: Wyndham, Wyndham Grand, Wyndham Garden, TRYP, Wingate, Hawthorn Suites, Microtel Inn & Suites, Ramada, Baymont Inn & Suites, Days Inn, Super 8, Howard Johnson, Travelodge, and Knights Inn. *Id.*

called a "resort fee" but sometimes called a "hotel service fee," "service charge," "facility fee," or "other tax."[3] Plaintiff refers to these fees collectively as "Resort Fees," and the hotels that charge them are the "RF Hotels." Guests using the Websites cannot opt out of these fees.[4]

During the relevant period, Defendants have operated www.wyndham.com, www.wyndhamhotelgroup.com, www.wyndhamhotels.com, and several other brand-level domains[5] which are collectively referred to as the "Websites." The Websites permit users to search for and book available Wyndham-affiliated hotel rooms.[6]

Users like Plaintiff and Class Members could search for a room on the Websites and enter the "booking path" or "flow" beginning at the "Landing" or "Home" pages,[7] where one can search for rooms on specified dates in a geographical area, which will generate a "List" or "Search Results" page.[8] That page displays available hotels and the supposedly lowest or best available price for a room at each hotel, labeled "Average nightly rate from" or just "From."[9] These prices—hereinafter "Room Rates"—are actually unobtainable at the RF Hotels because the Room Rates *always* exclude Resort Fees, and Website users cannot avoid the Resort Fees if they want the room.[10]  There is no reference to a Resort Fee on the "List" or "Search Result"

---

[3] *See* **Ex. 2** at WYN00237020; **Ex. 3**, Defs.' Am. Irog. Responses (hereinafter "**Ex. 3**") at Ex. A.
[4] **Ex. 4**, Goldstein Dep. Tr. 63:21–65:11; **Ex. 5**, 2d Krul Dep. Tr. 99:22–100:4.
[5] Plaintiff's Complaint refers to just the first two websites. Compl. ¶ 1. During the pendency of this litigation in 2016 and 2017, Defendants gradually migrated all of their brands to a redesigned, centralized website at www.wyndhamhotels.com, and now all three of the URLs listed above link to that same website. **Ex. 5**, 2d Krul Dep. Tr. 45:6–11, 57:3–25. Additionally, discovery revealed that Defendants also operate brand-level domains for all of their individual brands (e.g., www.daysinn.com). **Ex. 6**, 1st Krul Dep. Tr. 23:5–26:16. Today, all of these brand-level pages also redirect to a subpage of www.wyndhamhotels.com. **Ex. 5**, 2d Krul Dep. Tr. 45:6–11. As will be shown below and in the exhibits, these changes in website versions have no effect on the central allegations in the Complaint or the appropriateness of class certification.
[6] **Ex. 5**, 2d Krul Dep. Tr. 39:10–41:4; **Ex. 4**, Goldstein Dep. Tr. 34:10–35:5.
[7] *E.g.*, Compl. ¶ 45; **Ex. 7** at TL00249; **Ex. 3** at Ex. B.1.
[8] *E.g.*, Compl. ¶ 47; **Ex. 7** at TL00250; **Ex. 3** at Ex. B.2; *see also* **Ex. 5**, 2d Krul Dep. Tr. 15:7–17:2 (describing search process on old website); *id.* at 59:4–61:6 (describing search process on current website).
[9] *E.g.*, Compl. ¶ 47; **Ex. 7** at TL00250; **Ex. 3** at Ex. B.2.
[10] **Ex. 5**, 2d Krul Dep. Tr. 15:7–17:2, 59:4–61:6; **Ex. 4**, Goldstein Dep. Tr. 35:6–37:10.

3

page on any of the Websites.[11]

When users click on or near the advertised Room Rate, they are taken to a "Rooms and Rates" page for the hotel selected.[12] The room associated with the lowest advertised Room Rate is shown at the top, and other room types and Room Rate options are listed below. Again, all of the rates listed on the Rooms and Rates pages *always* exclude any Resort Fee at RF Hotels.[13] Resort Fees are only visible if the user clicks on a "total with taxes and fees" or "total for stay" hyperlink.[14] From the Rooms and Rates page, a user can click on the room type and rate and then is taken to the "Check-out" or "Booking" page, which is the final step before the user commits to booking the room. On that final page, the total price of the stay is shown, but the Resort Fees are always next to, or subtotaled within, the government-imposed taxes.[15]

On the Websites, when a user fills in contact and payment information on the Booking page, the user is required to accept the Terms of Use before the booking can be completed.[16] The Terms of Use in effect at the time of Plaintiff's website contained disclaimers of liability purportedly precluding users from recovering full damages for tort claims and requiring users to indemnify Defendants.[17] The current Terms of Use similarly state that Defendants "shall not be liable for damages or losses of any kind arising out of or in connection with your use of the Web Services or any information provided on the Web Services…"[18]

---

[11] **Ex. 4**, Goldstein Dep. Tr. 37:7–24.

[12] *E.g.*, Compl. ¶ 49; **Ex. 7** at TL00251; **Ex. 3** at Ex. B.3; *see also* **Ex. 5**, 2d Krul Dep. Tr. 64:11–17; **Ex. 4**, Goldstein Dep. Tr. 37:11–38:5. The Rooms and Rates page and the rest of the booking path can also be reached if the user started searching somewhere other than the home and landing pages of the Websites, such as Google or one of the hotel's individual webpages. **Ex. 4**, Goldstein Dep. Tr. 51:7–53:10.

[13] **Ex. 4**, Goldstein Dep. Tr. 40:6–42:2, 44:20–45:15 (discussing current Website); **Ex. 5**, 2d Krul Dep. Tr. 18:17–19:13 (discussing older Website).

[14] *E.g.*, Compl. ¶ 49; Krul Decl. [ECF 20-1] at Exs. C & D; **Ex. 3** at Exs. B.3 & B.4; *see also* **Ex. 5**, 2d Krul Dep. Tr. 19:1–20:15; **Ex. 4**, Goldstein Dep. Tr. 40:6–42:2.

[15] *E.g.*, Compl. ¶¶ 51–53; Krul Decl. [ECF 20-1] at Exs. E & F; **Ex. 3** at Exs. B.5 & B.6.

[16] **Ex. 5**, 2d Krul Dep. Tr. 79:7–17.

[17] Compl. ¶¶ 76, 84, 87; *see also* Krul Decl. [ECF 20-1] Ex. A at ¶¶ 10, 12.

[18] **Ex. 8**, 2d Krul Dep. Ex. 19 at pp. 5–6, ¶ 10; *see also* https://www.wyndhamhotels.com/about-us/terms-of-use (last accessed Oct. 15, 2018).

Plaintiff's experience with Defendants' Websites was typical of the process described above. Plaintiff accessed Defendants' Websites and used the Websites to reserve a room at Defendants' Shelbourne Wyndham Grand South Beach Hotel. Compl. ¶ 56.  Defendants' Websites represented the Room Rates for staying at the Shelbourne as $359.00/night. *Id.* at ¶¶ 56-60. In fact, the price with the mandatory $25.00/night resort fee was $384.00/night.  *Id.* at ¶¶ 57-60. During Plaintiff's booking process, the only reference to the Resort Fee displayed on any of the primary pages in the booking path was inconspicuous text on the Booking page that said:

> "Taxes and Fees: Tax not included
> Resort Fee USD 25.00 City Tax 7
> PCT State Tax 7 PCT"[19]

## II.  ARGUMENT

Plaintiff seeks to certify the following class for both the CFA and TCCWNA claims:

> All United States citizens who were charged a resort fee from June 6, 2010 to the present after booking a hotel room at a Wyndham-affiliated property using a Wyndham-owned website.

### A.  Legal Standards: Rule 23 and the Substantive Claims

To obtain class certification, Plaintiff must satisfy the requirements of Rule 23(a), along with one of the three requirements set forth in Rule 23(b).  *See Marcus v. BMW of North America, LLC*, 687 F.3d 583, 590 (3d Cir. 2012).  To meet the requirements of Rule 23(a): "(1) the class must be 'so numerous that joinder of all members is impracticable' (numerosity); (2) there must be 'questions of law or fact common to the class' (commonality); (3) 'the claims or defenses of the representative parties' must be 'typical of the claims or defenses of the class' (typicality); and (4) the named plaintiffs must 'fairly and adequately protect the interests of the class.' (adequacy of representation, or simply adequacy)."  *In re Cmty. Bank of N. Va.*, 622 F.3d

---

[19] Compl. ¶¶ 52–53.

275, 291 (3d Cir. 2010) (quoting Fed. R. Civ. P. 23(a)(1)–(4)).

In this case, Plaintiff seeks certification under Rule 23(b)(3), "which requires that (i) common questions of law or fact predominate (predominance), and (ii) the class action is the superior method for adjudication (superiority)." *In re Cmty. Bank of N. Va.*, 622 F.3d at 291. "A class certification decision requires a thorough examination of the factual and legal allegations." *In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 309 (3d Cir. 2008) (internal citation omitted). "[F]actual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." *Id.* at 307.

To violate the CFA, "a person must commit an 'unlawful practice[].'" *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994). The CFA declares as unlawful:

> any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission…

N.J.S.A. § 56:8-2. Such unlawful conduct includes "[t]he advertisement of merchandise as part of a plan or scheme not to sell the item or service…at the advertised price." N.J.S.A § 56:8-2.2. This type of scheme is commonly known as a "bait and switch." *See Riley v. New Rapids Carpet Center*, 61 N.J. 218, 222 (1972) (describing § 56:8-2.2 as a prohibition on bait-and-switch tactics).[20]

To prevail on a CFA claim, a private plaintiff must prove three elements: 1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss. *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543,

---

[20] For further illustration, FTC regulations also define "bait advertising" as "an alluring but insincere offer to sell a product or service which the advertiser in truth does not intend or want to sell. Its purpose is to switch consumers from buying the advertised merchandise, in order to sell something else, usually at a higher price or on a basis more advantageous to the advertiser. The primary aim of a bait advertisement is to obtain leads as to persons interested in buying merchandise of the type so advertised." 16 C.F.R. § 230.0.

557 (2009). Reliance is not an element of liability under the CFA. *Cox*, 647 A.2d at 462; *see also Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 366 (N.J. 1997). Rather, the "prime ingredient of all types of consumer fraud" is the "capacity to mislead." *Cox*, 647 A.2d at 462.

As explained below, each of the elements of the CFA claim in this case can be proven with class-wide, common proof. Importantly, it is the illegal advertising, pricing, and contractual practices of Defendants that are at issue, not the individual experiences of Plaintiff or the Class Members he seeks to represent.

### B.   The Class Satisfies Rule 23(a)

#### 1.   The Proposed Class is Sufficiently Numerous

To certify Plaintiff's proposed Class, this Court must determine whether the "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, the proposed Class is sufficiently numerous. In responding to written discovery, Defendants have estimated that between August 2012 and December 31, 2017, ███████████████ individuals booked a room using the Websites and were charged Resort Fees.[21] Notably, this estimate was made for hotels within just three brands: Wyndham, Wyndham Grand, and Wyndham Garden, which does not cover every RF Hotel.[22] Regardless, the number of Class Members far exceeds the 40-member benchmark referred to by the Third Circuit. Accordingly, numerosity is clearly established.

#### 2.   Plaintiff and the Class Meet the Commonality Prong

In order to obtain class certification, Plaintiff must also demonstrate that there are questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). Commonality requires that the class members' claims "depend upon a common contention…of such a nature that it is

---

[21] **Ex. 3** at 8.
[22] **Ex. 3** at 29 ¶ 6 (noting that responses were limited to those three brands).

capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 350 (2011). Even a single common question will satisfy the requirement of Rule 23(a)(2). *Id.* at 359. "[T]he focus is on whether the defendant's conduct was common as to all of the class members, not on whether each plaintiff has a 'colorable' claim." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 299 (3d Cir. 2011).

As to the CFA claim, whether Defendants engaged in illegal bait-and-switch scheme is a common contention that can be determined in one stroke for all class members. The RF Hotels prominently advertised Room Rates on the Websites in exactly the same manner. Defendants never intended to rent rooms to Plaintiff or the Class Members at those prices. Instead, Plaintiff and the Class Members were all deceived into paying the Room Rates *plus* mandatory Resort Fees. Defendants' scheme applies uniformly to every member of the Class and evidences "unlawful conduct," which is the first element of the CFA claim. Moreover, common evidence from Defendants' own records can be used to determine the Resort Fees paid by Plaintiff and the Class,[23] establishing the second element of the CFA claim—ascertainable loss.

If Defendants had honored the advertised Room Rates, *every* Class Member could and would have paid exactly those prices (plus government taxes) and nothing more to secure the rooms. Instead, *every* Class Member was deceived into paying a price above the advertised Room Rates in the form of the Resort Fees. Since there are only ▮▮▮▮▮▮▮▮▮▮ among the 5,500 hotels within the Wyndham family, guests who stay at more than ▮▮▮ of Wyndham hotels only need to pay the Room Rates, plus government taxes, to secure the room. Consequently, a common, reasonable expectation among consumers would be that the Room Rates Defendants

---

[23] **Ex. 3** at 11–12; **Ex. 9**, Harvey Dep. Tr. 18:22–22:23, 35:13–38:15, 40:13–41:18, 43:14–45:23.

advertise *are* the actual, full prices that are sufficient to book the rooms, excluding only government-imposed taxes.

The advertised Room Rates are extremely material to customers' decision-making because, as Defendants know, the Room Rates are a standardized metric[24] and are one of the primary factors that customers use to compare hotels to one another when deciding where to book.[25] Customer sensitivity (or elasticity) with respect to the Room Rates is so high that

███████████████████████████████████████████████████

███████████████.[26]

Defendants' use of the Room Rates as a bait to lure them into paying a more expensive total price caused the entire Class harm. As Plaintiff's expert, Vicki Morwitz, Ph.D. explains, Defendants' practices are examples of "partitioned" and "drip pricing," tactics that have been shown to cause consumers to underestimate actual prices and increase consumers' intention to purchase goods or services.[27] This is because consumers tend to "anchor" on the prominent prices they see first, and pay less attention to additional surcharges disclosed later in the process.[28] Additionally, Class Members were likely misled by Defendants' grouping of Resort Fees next to or subtotaled with government-imposed taxes, because they may not realize that the Resort Fees are not actually government taxes and are avoidable by staying at a different hotel in the area.[29]

This causal connection between the falsely advertised Room Rates and the Resort Fees paid is the same for each Class Member and establishes the final element necessary to set forth a

---

[24] **Ex. 4**, Goldstein Dep. Tr. 45:7–23, 94:20–97:25, 128:16–130:12.
[25] **Ex. 10**, Kukulski Dep. Tr. 62:14–63:3, 70:3–74:11; **Ex. 11**, Schafers Dep. Tr. 47:14–49:3, 100:19–104:7.
[26] **Ex. 10**, Kukulski Dep. Tr. 75:14–77:1, 86:2–12; **Ex. 11**, Schafers Dep. Tr. 101:12–19.
[27] **Ex 12**, Expert Report of Vicki Morwitz, Ph.D. at 5–8, 18–39.
[28] **Ex 12**, Expert Report at 6–7, 32–37, 44–45.
[29] **Ex 12**, Expert Report at 7, 40–44.

prima facie violation of the CFA. Each one of the elements of the CFA claim can be established with common proof, with the inquiry focusing largely on Defendants' conduct.

To determine whether the advertising of Room Rates and the placement of Resort Fees is a violation of the CFA, the jury can evaluate a relatively small amount of evidence, such as the Plaintiff's booking path, other representative examples of the Websites' booking paths for comparison, the testimony of Defendants' employees who have described the uniformity of these practices, and Plaintiff's Expert's Report describing how Defendants' decision to present information about mandatory Resort Fees separately from the Room Rates and later in process is an example of both partitioned and drip pricing, and the consumer effects of those practices.

As to the TCCWNA claim, the evidence shows only two different versions of the Terms of Use in effect during the class period, and both versions contained provisions that are illegal in the same ways alleged in Plaintiff's Complaint.[30] The evidence also shows that every guest who booked a room using the Websites was required to agree to the Terms of Use.[31] As a result, Defendants' liability for the TCCWNA claim turns solely on the common issue of whether the terms at issue in fact violated TCCWNA. Whatever the answer is, it is the same for all class members.

### 3.  Plaintiff's Claims are Typical of the Class Claims

"The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal*, 43 F.3d at 57.  Typicality "is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees by

---

[30] Krul Decl. [ECF 20-1] Ex. A at ¶¶ 10, 12; **Ex. 8**, 2d Krul Dep. Ex. 19 at pp. 5–6, ¶ 10.
[31] **Ex. 5**, 2d Krul Dep. Tr. 30:3–20, 79:7–17.

requiring that the common claims are comparably central to the claims of the named plaintiffs as to the claims of the absentees." *Id*. "When a defendant has engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members." *Sherman v. American Eagle Exp., Inc.*, No. 09-575, 2012 WL 748400, at *5 (E.D. Pa. March 8, 2012) (citing *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 207 (E.D. Pa. 2001)).

Plaintiff's claims are typical and his damages are not substantially different in kind or size than the average Class Member's. There are only two claims, both are shared by Plaintiff and the Class, and damages will be measured the same way for all. Defendants' practices of advertising unobtainable Room Rates and binding all guests to illegal terms and conditions were carried out in a uniform manner.  Although the Websites were redesigned in 2016–17, the fundamental aspects of the booking path did not change, nor did the partitioned/drip-pricing practices.[32] The Room Rates continue to be the only prominently displayed prices, and Resort Fees are still not disclosed at all but rather are hidden in hyperlinks or outside the booking path.[33] Within the booking path Resort Fees are *always* subtotaled with or grouped next to government-imposed taxes.[34] And every website user, including Plaintiff, was required to agree to Terms and Conditions that contain illegal disclaimers.[35] Plaintiff satisfies the typicality prong.

### 4.  Plaintiff Is an Adequate Representative of the Class

Rule 23(a)(4) requires a showing that the named plaintiff "will fairly and adequately protect the interests of the class." "This requirement serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*,

---

[32] Compare Krul Decl. [ECF 20-1] Exs. C–G with **Ex. 3** at Exs. B.1–B.8.
[33] *See* **Ex. 3** at Exs. B.1–B.8; **Ex. 12** at 8–16 (Expert's description of room searches conducted on current Websites).
[34] *See* **Ex. 3** at Exs. B.1–B.8; **Ex. 12** at 8–16 (Expert's description of room searches conducted on current Websites).
[35] Krul Decl. [ECF 20-1] Ex. A; **Ex. 8**, at pp. 5–6, ¶ 10; **Ex. 5**, 2d Krul Dep. Tr. 30:3–20, 79:7–17.

521 U.S. 591, 625 (1997).  Plaintiff easily satisfies this requirement. There are no divergent claims or other types of conflicts between Plaintiff and Class Members. Plaintiff shares the exact same claims under the CFA and TCCWNA as the other Class Members, and there are no unique circumstances that would render him an inadequate representative. Plaintiff and the Class Members possess the same interest in proving the same claims, and they suffered the same form of injuries.  Plaintiff has worked with counsel to advance the interests of the class by sharing information and evidence about his experience with Defendants' unlawful practices and responding to written discovery requests, including a thorough search of his personal emails.[36] As such, Plaintiff has inarguably demonstrated his commitment to prosecuting this case on behalf of himself and the proposed Class, and that he will do so fairly and adequately.

Plaintiff proposes Gary F. Lynch of Carlson Lynch Sweet Kilpela & Carpenter, LLP as Lead Class Counsel.  Mr. Lynch has extensive experience managing and litigating complex class actions such as this one, and is well-versed in the applicable law. The resume of Gary Lynch and his firm is attached as **Exhibit 13**. Accordingly, Rules 23(a)(4) and (g) are satisfied.

### C.    The Proposed Class Satisfies the Requirements of 23(b)(3)

Rule 23(b)(3) requires that "questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The Third Circuit has explained, "[The] predominance test asks whether common issues of law or fact in the case predominate over non-common, individualized issues of law or fact.  Predominance begins, of course, with the elements of the underlying cause of action."  *Neale v. Volvo Cars of North America, LLC*, 794 F.3d 353, 370 (3d Cir. 2015) (citations

---

[36] Lynch Decl. ¶ 14.

and quotation marks omitted).  Nevertheless, "the presence of individual questions does not *per se* rule out a finding of predominance.  If issues common to the class overwhelm individual issues, predominance should be satisfied."  *Id.* at 371. "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (internal quotation marks omitted).

As detailed above, Plaintiff and the Class seek to hold Defendants liable for two specific practices: 1) segmenting the actual price of hotel rooms at the RF Hotels such that rooms could not be obtained at the prominently advertised Room Rates (the CFA Claim), and 2) binding every guest who booked a room through the Websites to unlawful terms and conditions (the TCCWNA claim). There are no aspects of these claims that need to be proven on an individual basis. Common issues, regarding both liability and damages, unquestionably predominate over individual issues. As previously described, it was impossible for Plaintiff or any class member to use the Websites to book a room for the Room Rates at the RF Hotels. Instead, every Class Member paid a Resort Fee and was bound to the illegal Terms of Use.

Damages calculations would not overwhelm questions common to the Class in this case because there is no need for individualized damage determinations before judgment.  Class-wide damages can be proven directly based upon information in possession of Defendants, including the amount of resort fee revenue generated by RF Hotels (the CFA damages) and the number of resort-fee-paying guests.[37] Indeed, Defendants have already calculated the Resort Fees paid to RF Hotels, demonstrating the ease of calculating class-wide damages.[38] Since the number of

---

[37] **Ex. 9**, Harvey Dep. Tr. 18:22–22:23, 35:13–38:15, 40:13–41:18, 43:14–45:23.
[38] **Ex. 3** at 11–12 (estimating for three of the brands that between August 2012 and December 31, 2017, ██████ ████████████████████████████████████████████████

Class Members is the same for both the CFA and TCCWNA claim, the TCCWNA damages can be discerned by simply multiplying the number of unique individuals who paid a Resort Fee by the statutory damage amount of $100.

The Federal Rules of Civil Procedure direct courts to weigh the following factors to determine whether a class action is superior to other alternative methods of adjudication: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(A)–(D).  In light of these factors, this Court should find that class action treatment is most appropriate in this case.

Here, the above-stated factors strongly support class certification.  First, the Class Members are unlikely to pursue individual litigation, as the average damage awards would be no more than a few hundred dollars.[39] Given the small value of possible recovery, these class members would lack the incentive to bring individual suits against Defendants.  *See Lake v. First Nationwide Bank*, 156 F.R.D. 615, 626 (E.D. Pa. 1994). New Jersey courts recognize that low-value individual CFA claims are particularly well-suited to be litigated as class actions because "[t]he whole point of a class action is to provide a diffuse group of persons, whose claims are too small to litigate individually, the opportunity to engage in collective action and to balance the scales of power between the putative class members and a corporate entity." *Lee*, 203 N.J. at 528–29. Last, no apparent difficulties are evident in managing this lawsuit as a class action. In terms of fairness and efficiency, a class action lawsuit is unquestionably superior.

---

[39] The estimates discussed in *supra* note 38 yield an average Resort Fees of ██████ ██████

### D.    The Class is Ascertainable

A plaintiff seeking class certification of Rule 23(b)(3) class must also prove by a preponderance of the evidence that the class is ascertainable.  *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015).  The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is "defined with reference to objective criteria"; and (2) there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."  *Byrd*, 784 F.3d at 163.

Plaintiff is moving to certify a class of all guests who paid a resort fee at a Wyndham hotel since June 6, 2010 and booked through the Wyndham websites.  The proposed class is defined with objective criteria, *e.g.*, to be a class member, a person must have been charged a resort fee at a Wyndham hotel, and must have booked using the Websites.  Defendants have most of this data for all Wyndham-affiliated hotels ███████████[40] Defendants can retrieve this information with relative ease using ███████████████████████ in conjunction with simple clerical work.[41]  Guests who were charged a Resort Fee were required to provide their names and address when booking a room, and this information is maintained by Defendants as well.[42] Accordingly, the proposed Class is ascertainable.

## III.   CONCLUSION

For the above-stated reasons, this Court should certify a class under Fed. R. Civ. P. 23, appoint Gary F. Lynch as class counsel, and direct the parties to confer regarding a notice plan to be submitted to the Court.

---

[40] **Ex. 9**, Harvey Dep. Tr. 18:22–22:23, 35:13–38:15, 40:13–41:18, 43:14–45:23.
[41] *Id.*
[42] **Ex. 9**, Harvey Dep. Tr. 31:7–32:7.

Dated:  October 15, 2018

Respectfully submitted,

By: _/s/ Gary F. Lynch_
Gary F. Lynch
glynch@carlsonlynch.com
Jamisen A. Etzel
jetzel@carlsonlynch.com
**Carlson Lynch Sweet Kilpela & Carpenter, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
T: (412) 322-9243
F: (412) 231-0246

Joseph P. Guglielmo
Erin Green Comite
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
jguglielmo@scott-scott.com
ecomite@scott-scott.com

_Counsel for Plaintiff_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 15, 2018, I served a true and correct copy of the redacted version of the foregoing document by filing it on this court's CM/ECF system, which will cause service on all email accounts listed on the electronic service list, including counsel of record for all parties. In addition, the unredacted version of the foregoing document will be served on counsel of record for Defendants via email on today's date and via overnight carrier within two business days as follows:

K. Winn Allen
Ronald K. Anguas, Jr.
Zachary A. Avallone
**Kirkland & Ellis LLP**
655 15th Street NW
Washington, DC 20005
winn.allen@kirkland.com
ronald.anguas@kirkland.com
zachary.avallone@kirkland.com

*/s/ Gary F. Lynch*
Gary F. Lynch