## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THOMAS LUCA, JR., individually and on behalf
of all others similarly situated,

                Plaintiff,                Civil No. 2:16-cv-00746 (MRH)

      v.

WYNDHAM HOTEL GROUP, LLC and        Electronically Filed and Served
WYNDHAM HOTELS AND RESORTS, LLC,

                Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 2

    A.    Wyndham's Resort Fee Practices .......................................................... 2

    B.    Plaintiff's Experience at the Wyndham Grand Shelborne South Beach ................. 4

ARGUMENT ..................................................................................................................... 6

I.    THE PROPOSED CFA CLASS DOES NOT SATISFY THE PREDOMINANCE REQUIREMENT OF RULE 23(b)(3). ........................................... 6

    A.    Individualized Inquiries Are Necessary To Prove A Causal Link Between Defendants' Conduct And Class Members' Purported Ascertainable Loss. .......... 7

        1.    Plaintiff Has Not Proven That Resort Fees Were "Unknowable" To Class Members. ........................................................................................... 9

        2.    Plaintiff Has Not Proven That Class Members Reacted Uniformly To Information About Resort Fees. ........................................................ 13

    B.    Plaintiff Has No Viable Theory Of Class-Wide Ascertainable Loss. .................... 17

II.    THE PROPOSED CFA CLASS DOES NOT SATISFY THE COMMONALITY OR TYPICALITY REQUIREMENTS OF RULE 23(a). ........... 21

III.    THE PROPOSED TCCWNA CLASS CANNOT BE CERTIFIED. ......................... 23

CONCLUSION ............................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraham v. Ocwen Loan Servicing, LLC*,
   321 F.R.D. 125 (E.D. Pa. 2017) ............................................................. 7, 9, 13, 17

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ......................................................................................... 6

*Ctr. City Periodontists, P.C. v. Dentsply Int'l*,
   321 F.R.D. 193 (E.D. Pa. 2017) ...................................................................... 22

*Dilley v. Acad. Credit, LLC*,
   2008 WL 4527053 (D. Utah Sept. 29, 2008) ................................................. 22

*Dugan v. TGI Fridays, Inc.*,
   171 A.3d 620 (N.J. 2017) ...................................................................... 20, 24, 25

*Feldman v. Google, Inc.*,
   513 F. Supp. 2d 229 (E.D. Pa. 2007) .............................................................. 25

*Gonzalez v. Corning*,
   885 F.3d 186 (3d Cir. 2018) .............................................................................. 6

*Hammer v. Vital Pharm., Inc.*,
   2015 WL 12844442 (D.N.J. Mar. 31, 2015) ..................................................... 7

*Harnish v. Widener Univ. Sch. of Law*,
   833 F.3d 298 (3d Cir. 2016) ................................................................... 7, 17, 20

*Hillis v. Equifax Consumer Servs.*,
   237 F.R.D. 491 (N.D. Ga. 2006) ..................................................................... 22

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008) .............................................................................. 6

*Int'l Union of Operating Eng'rs v. Merck & Co.*,
   929 A.2d 1076 (N.J. 2007). ........................................................................ 6, 7, 9

*Kendall v. CubeSmart, L.P.*,
   2016 WL 1597245 (D.N.J. Apr. 21, 2016) ...................................................... 23

*Lee v. Carter-Reed Co.*,
   4 A.3d 561 (N.J. 2010) ....................................................................................... 9

*Marcus v. BMW of North America, LLC*,
   687 F.3d 583 (3d Cir. 2012) ....................................................................1, 7-11, 13-15, 17, 18

*Mielo v. Steak 'n Shake*,
   897 F.3d 467 (3d Cir. 2018) ........................................................................................ 21

*N.J. Citizen Action v. Schering-Plough Corp.*,
   842 A.2d 174 (N.J. App. Div. 2003) ........................................................................... 20

*Rudel Corp. v. Heartland Payment Sys., Inc.*,
   2016 WL 4472944 (D.N.J. Aug. 23, 2016) ................................................................. 23

*Spade v. Select Comfort Corp.*,
   181 A.3d 969 (N.J. 2018) ....................................................................................... 23, 24

*Thiedemann v. Mercedes-Benz USA, LLC*,
   872 A.2d 783 (N.J. 2005) ............................................................................................ 20

**Statutes**

N.J.S.A. 56:12-15 ............................................................................................................. 24

N.J.S.A. 56:12-17 ............................................................................................................. 24

## INTRODUCTION

Plaintiff's proposed class should not be certified because it presents the very barriers to class certification that the Third Circuit identified in *Marcus v. BMW of North America, LLC*, 687 F.3d 583 (3d Cir. 2012). *Marcus* recognized that a plaintiff seeking to certify a class under the New Jersey Consumer Fraud Act ("CFA") faces a fundamental problem: A person cannot succeed on a CFA claim if that person knew about the allegedly omitted or misrepresented information, yet decided to purchase the product anyway. In such a case, actual knowledge breaks the casual link between the alleged unlawful conduct and the claimed loss. An individualized inquiry is necessary to determine which class members had such knowledge and which did not, and that individualized inquiry creates a "predominance problem" under Rule 23. *Id.* at 598.

Plaintiff's class-certification arguments fail for that very reason. The resort fees at issue were widely disclosed to consumers, both on Wyndham's own websites and in numerous other sources consumers typically consult before booking a hotel room. Moreover, the evidence shows that consumers still choose to book at Wyndham properties even with full knowledge of any applicable resort fees. The proposed class therefore includes a large number of consumers with no viable CFA claim, and the individualized inquiries necessary to root out those class members would swamp any common questions that could be proven with class-wide evidence.

This "predominance problem" that *Marcus* identified is all the worse in a case like this one because plaintiff purports to challenge the resort fees charged at more than 30 different hotels over an eight-year period. Those hotels are located in different cities, have different amenities, are in different pricing segments, and are in different competitive environments. Each hotel charges a different resort fee amount (ranging from $2 to $28) and different room rates that themselves change daily and also vary based on the type of room booked. This Court cannot adjudicate on a class-wide basis the purchasing decisions of hundreds of thousands of consumers who booked

different rooms at different hotels charging different rates for different levels of service.

Plaintiff's proposed CFA class also fails for other reasons.  Plaintiff has not identified a viable method of establishing ascertainable loss on a class-wide basis, nor do his claims satisfy the commonality and typicality requirements of Rule 23(a) because he seeks to represent class members with booking experiences and claims markedly different from his own.  Moreover, plaintiff has not met his burden of certifying a class under the Truth-in-Consumer Contract, Warranty and Notice Act ("TCCWNA") because he cannot prove on a class-wide basis that all class members were harmed as a result of the allegedly unlawful provisions in those terms.

For these reasons and those that follow, plaintiff has not satisfied the requirements of Rule 23, and his motion for class certification should be denied.

## BACKGROUND

### A.    Wyndham's Resort Fee Practices

Wyndham Hotel Group, LLC, through various subsidiaries, franchises, manages, or owns more than 5,500 hotels in the United States under a number of different brands in different pricing segments.  *See* Ex. 2 (Defs.' 2d Am. Resps. to Interrogs. ("Resps.")) at 2-3; Ex. 3 (Form 10-K) at 8.[1]  Only around 32 of those hotels charged a resort fee at some point during the class period, including hotels operating under the Wyndham, Wyndham Garden, Wyndham Grand, Days Inn, Dolce, Ramada, and Super 8 brands.  *See* Ex. 2 (Resps.) at Ex. A; Ex. 4.  Across the U.S. lodging industry as a whole, more than 3,500 hotels charge resort fees.  Ex. 5 (Bowen Report) ¶ 15.

The few Wyndham-affiliated hotels that charged resort fees did so because they provide amenities and services beyond a standard room, such as shuttle service to local attractions, organized children's activities, in-room coffee and bottled water, and access to recreational

---

[1] Exhibits are attached to the Declaration of Ronald K. Anguas, Jr., filed concurrently herewith.

facilities.  *E.g.*, Ex. 2 (Resps.) at 17-18.  Resort fees allow Wyndham and other hotel companies to offer a package of these types of amenities for a single price, rather than charge "à la carte" for each amenity that guests use during their stay. Ex. 5 (Bowen Report) ¶ 13.  Wyndham's experience has shown that consumers prefer to pay a single price rather than be "nickel and dimed" for each separate service.  *E.g.*, Ex. 6 (Schafers Dep.) 19:23-20:10 ("Consumer feedback was they didn't like seeing independent charges for all these services."); Ex. 25 (Kukulski Dep.) 69:5-9 ("[T]he nickel and dime factor comes in when every time they stop at a desk and they have to pay for this and they have to pay for that.  So most resorts choose to have resort fees for that reason. It's more transparent than getting to a resort, getting to your room, wanting a bottle of water, charging $10.").

The decision to charge a resort fee at a Wyndham-affiliated property is made, and the amount of the fee is set, at the property level.  These decisions are based on factors specific to each property, including the location of the property, the nature of the amenities offered, and whether hotels in the same market charge a resort fee.  *See* Ex. 2 (Resps.) at 20; Ex. 7 (Belanger Dep.) 24:13-25:1, 81:3-82:21; Ex. 6 (Schafers Dep.) 46:13-47:13.  Many of the Wyndham-affiliated properties that charge resort fees are located in leisure travel markets such as Las Vegas, Orlando, and South Florida, where most other comparable hotels also charge resort fees for similar amenities.  Ex. 5 (Bowen Report) ¶ 15.  ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████

Resort fee amounts and the amenities they cover vary widely across Wyndham-affiliated properties.  For example, at times during the class period, the Wyndham Grand Orlando Bonnet Creek charged a $28 resort fee that covered, among other amenities: shuttle service to theme parks; five pools, nine hot tubs, and four water play areas; discounts off spa services; and complimentary

meals for children.  Ex. 2 (Resps.) at 17.  The Wyndham Grand Jupiter in South Florida charged a $12 resort fee that covered, among other amenities: use of pool chairs and towels, in-room coffee, use of the fitness and business centers, and newspapers.  Ex. 9 (WYN00237024).  Other properties in the Wyndham portfolio charged resort fees as low as $2 or $3.  Ex. 2 (Resps.) at 17; Ex. 3.  The goal of these resort fees is to allow properties "to provide [] amenities, offer them at a value to our customers and offset costs associated with them."  Ex. 6 (Schafers Dep.) 69:11-13.

Wyndham discloses resort fees on its booking websites, www.wyndham.com and www.wyndhamhotelgroup.com (the "Websites"), consistent with guidance issued in 2012 by the FTC and referenced in plaintiff's brief.  *See* Ex. 10 (TL00011); Pl.'s Br. (ECF No. 104) at 2 n.1. Wyndham redesigned the Websites in 2012 and again in 2016, Ex. 2 (Resps.) at 3-5, and the location and form of the resort fee disclosures changed in each iteration.  However, in all three versions, Wyndham disclosed the resort fee on three different pages in the booking process. Moreover, as instructed by the FTC, Wyndham included the resort fee in the bolded "Total for Stay" amount presented to consumers before they enter their payment information or finalize a reservation.  *E.g.*, Ex. 2 (Resps.) at Ex. B.5 (current version); Ex. 1 (V. Krul Decl.) at 17-21 (2012-2016 version); Ex. 11 (WYN00429670) (pre-2012 version).  Resort fee information is also available through a variety of other channels that consumers often consult before making a hotel reservation.  *See infra* at I.A.1.

**B.    Plaintiff's Experience at the Wyndham Grand Shelborne South Beach.**

On May 23, 2016, Mr. Luca visited the Websites and booked a two-night stay at the Wyndham Grand Shelborne South Beach.  Compl. ¶¶ 56-61.  He arrived at the Websites after viewing the Shelborne and other hotels on a different travel site.  Ex. 12 (Pl.'s Resps. to Interrogs.) at No. 2.  Mr. Luca was drawn to the Shelborne because of its particular location and testified that he "was going to book a room at this hotel no matter what it cost."  Ex. 13 (Luca Dep.) 147:8-12.

During the booking process, Mr. Luca was offered a nightly rate of $359 for his preferred room type and was advised that the room rate was subject to taxes and fees, including a $25 nightly resort fee, a 7% state tax, and a 7% city tax. *See* Ex. 14 at TL00002. He was quoted a "Total for Stay" of $868.52 for the reservation. *Id*. Mr. Luca admits that he saw and knew about the Total for Stay amount before he completed his booking and admits that the $868.52 he was quoted included two $25 resort fee charges. *See* Ex. 13 (Luca Dep.) 154:8-15 ("Q. … [W]hen you input[] your credit card information and reserved your room, you knew you were going to have to pay $868.52, right? A. I did."), 204:20-22 ("Q. But it does include the resort fee itself; correct? A. If you do math, that's how I see it."). Mr. Luca finalized his booking and received a confirmation e-mail that again disclosed the $25 resort fee and included the resort fee in the Total for Stay amount. *See* Ex.15 (TL00248); Ex. 16 (WYN00003640).

Mr. Luca arrived at the Shelborne four days later on May 27, 2016. At the conclusion of his stay, he was presented with a final invoice for $875.52 that included two $359 room rate charges, two $25 resort fee charges, and $107.52 in applicable taxes. *See* Ex. 14 at TL00006. Due to a technical problem with the Websites that lasted approximately four months and was limited only to the Shelborne, the government taxes on the resort fee itself—which totaled $7 for Mr. Luca's reservation—were not included in the Total for Stay amount Mr. Luca had been quoted on the Websites when he booked. *See* Ex. 17 (Krul 30(b)(6) Dep.) 97:9-98:13.

About a week after returning from his trip, Mr. Luca filed this putative class action alleging that Wyndham's resort fee disclosures violated the CFA. Mr. Luca also alleged that Wyndham violated the TCCWNA because the Websites' terms of use contained damages limitations and an indemnification clause. Mr. Luca concedes, however, that he never actually saw the terms of use or read them prior to booking his room or filing suit. Ex. 13 (Luca Dep.) 194:23-195:18. Mr.

Luca seeks to certify a class for both claims that includes: "All United States citizens who were charged a resort fee from June 6, 2010 to the present after booking a hotel room at a Wyndham-affiliated property using a Wyndham-owned website."  Pl.'s Br. at 5.

## ARGUMENT

## I.     THE PROPOSED CFA CLASS DOES NOT SATISFY THE PREDOMINANCE REQUIREMENT OF RULE 23(b)(3).

To certify a class under Rule 23(b)(3), a plaintiff must establish that "questions of law or fact common to class members predominate over any questions affecting only individual members."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008).  The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," which imposes a standard "far more demanding" than the Rule 23(a) commonality requirement.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997).  This determination "requires a rigorous assessment of the available evidence" to determine whether "proof of the essential elements of the cause of action requires individual treatment."  *Gonzalez v. Corning*, 885 F.3d 186, 195 (3d Cir. 2018).

A CFA claim has three elements: (1) unlawful conduct; (2) ascertainable loss; and (3) a causal connection between the unlawful conduct and the ascertainable loss.  *Int'l Union of Operating Eng'rs v. Merck & Co.*, 929 A.2d 1076, 1086 (N.J. 2007).  Although plaintiff must satisfy the predominance requirement with respect to all three elements, *see In re Hydrogen Peroxide*, 552 F.3d at 311-12, his class-certification brief focuses primarily on only the first element.[2]  Plaintiff's proposed CFA class fails, however, because he has not proven that common

---

[2] Plaintiff's class-certification arguments with respect to the first element of his CFA claim, unlawful conduct, fail to satisfy the commonality and typicality requirements of Rule 23(a) as set forth below.  *See infra* at II.

questions predominate with respect to the second and third elements of his claim.

      **A.**      **Individualized Inquiries Are Necessary To Prove A Causal Link Between Defendants' Conduct And Class Members' Purported Ascertainable Loss.**

Plaintiff's class allegations fail the predominance requirement of Rule 23(b)(3) because individualized inquiries are necessary to establish the causation element of his CFA claim. To recover under the CFA, a plaintiff must establish a causal relationship between the defendant's allegedly unlawful conduct and the plaintiff's ascertainable loss. *See, e.g.*, *Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 305 (3d Cir. 2016); *Merck*, 929 A.2d at 1086. Actual knowledge of the allegedly omitted or misrepresented information, however, breaks the causal link. As the Third Circuit has explained, "when a plaintiff knows the truth behind a fraudulent misrepresentation or omission, that plaintiff may not succeed under the [CFA]" because the plaintiff's knowledge will "break the proximate cause link" between the alleged misrepresentation and "any damages suffered." *Marcus*, 687 F.3d at 598 & 609. In the context of a class action alleging a CFA violation, "[d]etermining whether a class member had such knowledge requires an individualized inquiry," and "[t]hat creates a predominance problem" because individualized questions of causation will predominate over common ones. *Id.* at 598; *see also Abraham v. Ocwen Loan Servicing, LLC*, 321 F.R.D. 125, 192 (E.D. Pa. 2017) ("[W]e conclude that individual issues about what each putative class member knew and how they would have acted 'swamp the inquiry' on causation, making the … [CFA] claims inappropriate for class treatment."); *Hammer v. Vital Pharm., Inc.*, 2015 WL 12844442, at *8-9 (D.N.J. Mar. 31, 2015) (denying certification of CFA class because individualized inquiries were necessary to identify class members with knowledge of the purported misrepresentations).

Plaintiff has a "predominance problem" here because individualized inquiries are necessary to determine whether any given class member knew about the resort fee prior to booking

a Wyndham hotel.  Class members who had such knowledge cannot recover because there is no causal link between Wyndham's resort fee disclosures and their alleged losses.  Plaintiff tries to avoid this predominance problem by invoking a presumption of causation, claiming that "*every* Class Member was deceived into paying a price above the advertised Room Rates."  Pl.'s Br. at 8.  But that approach is foreclosed by Third Circuit and New Jersey law.

*Marcus* sets forth the narrow circumstances in which a plaintiff can invoke a presumption of causation under the CFA.  The plaintiffs in that case sought to certify a class of consumers who purchased BMW automobiles with Bridgestone "run-flat" tires.  *Marcus*, 687 F.3d at 588.  The tires performed as expected when "flat," but the plaintiff claimed that BMW violated the CFA when it failed to disclose that the tires were "defective" because they "fail at a significantly higher rate" than other tires and "cannot be repaired, only replaced."  *Id.*  In overturning the district court's class-certification decision and remanding for further consideration, the Third Circuit focused on the likelihood that some class members "knew" or "could have known" about the alleged defects, "yet decided to purchase or lease a BMW anyway."  *Id.* at 607, 611.  The court explained that plaintiffs could invoke a presumption of causation only if the evidence showed that no more than an "insignificant number of class members" actually knew of the allegedly omitted information and purchased anyway.  *Id.* at 611.  Otherwise, a presumption would be inappropriate because the class would include a significant number of individuals with no viable CFA claim.

To avoid that possibility, *Marcus* held that, to obtain certification of a CFA class based on a presumption of causation, a plaintiff must prove by a preponderance of the evidence that: (1) the truth behind the alleged misrepresentation was "not knowable" to a significant number of class members before they purchased; or (2) even if the alleged omitted information was knowable, "class members were nonetheless relatively uniform in their decisionmaking."  *Id.*; *see also*

*Abraham*, 321 F.R.D. at 191.[3]  The Court was clear that "these findings cannot be side-stepped" in a CFA class action.  *Marcus*, 687 F.3d at 611.  If class members could have known of the allegedly omitted information, and if the "evidence suggests that class members did not react to information about the product they purchased ... in a sufficiently similar manner," then "individual questions related to causation will predominate."  *Id.* at 610-11.

Here, the evidence shows that resort fees were "knowable" to a significant number of class members because those fees were disclosed during the booking process on Wyndham's Websites, and because resort fee information is broadly available from a variety of other sources that consumers frequently consult before they arrive at the Websites.  The record also makes clear that class members did not react to information about resort fees "in a sufficiently similar manner" to permit class certification.  *Id*.  Plaintiff thus cannot meet his burden of establishing that a presumption of causation applies, and his class allegations fail the predominance requirement.

          1.       Plaintiff Has Not Proven That Resort Fees Were "Unknowable" To Class Members.

Plaintiff has marshaled no evidence to show that resort fees were "unknowable" to class members.  Nor could he.  The record shows that resort fees at Wyndham properties were "knowable" to class members through a variety of channels.

To begin, resort fees were disclosed to consumers repeatedly as they moved through the booking flow on Wyndham's Websites.  On the version of the Websites that Mr. Luca used—which was operational from 2012 to 2016—the resort fee was disclosed at least seven times on three different pages in the booking flow, in a manner consistent with guidance from the FTC.

---

[3] This two-part test stems from the New Jersey Supreme Court's decisions on the causation element of the CFA.  *See Merck*, 929 A.2d 1086; *Lee v. Carter-Reed Co.*, 4 A.3d 561 (N.J. 2010).  Because causation is an element of *every* CFA claim, the two-part test from *Marcus* must be satisfied in *every* CFA class action based on an alleged misrepresentation or omission.

Although Mr. Luca claims he did not see them, these disclosures make clear that "the allegedly omitted information was available to class members." *Marcus*, 687 F.3d at 611.

Consumers started their visit to the Websites by entering a destination and selecting a Wyndham-affiliated property in the area.  Consumers then arrived at the "Room Rates Page," Ex. 1 (Booking Flow[4]) at 15, which presented different room types at the property (for instance, a city view with a king bed), each with a corresponding room rate.  Beneath the rate for each room type was a hyperlink labeled "View total cost with taxes & fees."  Clicking that hyperlink generated a pop-up that disclosed any applicable resort fee, a bolded total of "Estimated taxes & fees" that included the resort fee, and an even larger and bolded "Total for Stay" amount that included the nightly rate, resort fee, and other applicable taxes.  *Id.* at 17.

After selecting a room type, consumers advanced to the "Checkout Page."  *Id.* at 19.  This page included three sets of resort fee disclosures.  Near the top of the Checkout Page, consumers encountered a bold heading labeled "Taxes and Fees," under which appeared the text "Resort Fee" followed by the dollar amount of that fee for a given hotel.  In the middle of the page, adjacent to the nightly room rate, Wyndham disclosed the total amount of taxes and fees to be charged for the stay, including the resort fee.  Immediately beneath that total was a hyperlink inviting consumers to "View taxes & fees" associated with the booking.  Clicking that hyperlink would have generated the same pop-up box described above with the same set of resort fee disclosures.  *Id.* at 21.  Finally, the resort fee amount was included in a bolded "Total for Stay" number displayed to all consumers directly on the Checkout Page, adjacent to the "View taxes & fees" hyperlink.

After entering their contact and payment information and finalizing the reservation,

---

[4] For the Court's convenience, Wyndham has included as Exhibit 1 a copy of the booking flow for the version of the Websites that Mr. Luca used to book his room at the Shelborne.  These images are contained in the Declaration of Volodya Krul, previous filed with the court as ECF No. 20-1.

consumers then advanced to the "Confirmation Page," Ex. 1 (Booking Flow) at 23, which is similar to the Checkout Page and contains the same set of resort fee disclosures.  By this time, Wyndham had also sent a reservation confirmation e-mail that disclosed both the specific resort fee amount as a standalone number and a Total for Stay amount that included the resort fee.  *See* Ex. 16 (WYN00003640).  Although consumers received these disclosures after they had completed their booking, many could still cancel their reservations without penalty at that point.  *E.g.*, *id.* (explaining reservation can be cancelled without penalty until one day prior to check-in).

Every member of the proposed class completed the booking process on Wyndham's Websites and was presented with the multiple resort fee disclosures described above.  But many class members also encountered additional information about resort fees from other sources they consulted before they even visited the Wyndham Websites to make a reservation.  Indeed, a clear majority of consumers who book on a hotel's own website begin their search elsewhere and use sources beyond that website to gather information about their travel options.  *See* Ex. 5 (Bowen Report) ¶¶ 37-38; *see also* Ex. 18 (Goldstein Dep.) 132:23-133:8 (explaining that consumers arrive at the Websites after having reviewed up to 37 different websites in search of information regarding their trip).  Those sources include information about resort fees and thus make "the allegedly omitted information … available to class members."  *Marcus*, 687 F.3d at 611.

For instance, more than 90% of consumers who eventually book on a hotel website consult online travel agencies ("OTAs") or meta-search sites such as Expedia, Travelocity, Orbitz, Kayak, or Hotels.com at some point during their research process.  Ex. 5 (Bowen Report) ¶ 38.  Consumers find those websites to be among the most useful online travel resources because they provide information on hotels across different brands in one place.  *Id.* ¶¶ 17, 39.  Significantly, OTA websites disclose the resort fees charged at Wyndham properties (as well as other competitor

properties).  *E.g.*, Ex. 19 (WYN00072060) (resort fee at Wyndham Grand Jupiter disclosed on Expedia); Ex. 20 (WYN00072058) (Booking.com); *see also* Ex. 5 (Bowen Report) ¶¶ 17-18.

Prior to booking, many consumers also read travel guidebooks and online hotel reviews authored by fellow travelers.  *Id.* ¶ 37 (explaining that ██████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████.).  Leading travel publications—including the electronic versions of Frommer's and Fodor's travel guides—mention the resort fee at various Wyndham properties.  *See id.* ¶ 19.  Similarly, the very first sentence of the New York Times review of the Shelborne explains that the hotel offers rooms "starting at $269, plus a $25 per day resort fee."  *Id.* ¶ 20 & Appx. J.  Online reviews written by fellow travelers on sites such as TripAdvisor reference resort fees as well.  *See id.* ¶ 22.

Wyndham itself discloses resort fees through channels other than its own booking websites. For instance, online and print advertisements for specific properties in the Wyndham portfolio disclose that advertised nightly room rates are subject to a separate resort fee.  *E.g.*, Ex. 21 (WYN00073660) (Wyndham Grand Clearwater Beach offering promotional "rates from $129.00" plus "reduced $10.00 resort fee"); Ex. 22 (WYN00074049) (Dolce Aspen Meadows offering $139 rate "Per night, single/double, plus tax, plus $18 Resort Fee"); Ex. 5 (Bowen Report) ¶ 25.  And some hotels in the Wyndham portfolio also disclose resort fees on their own vanity sites that are available to consumers before they arrive at the booking website.  For instance, the Wyndham Grand Orlando Bonnet Creek explains on its vanity site, wyndhamgrandorlando.com, that the property charges a resort fee of $28 per day and lists the specific amenities covered by the fee.  *See* Ex. 2 (Resps.) at Ex. D.1.  Other Wyndham properties have similar disclosures on their vanity sites.  *See, e.g.*, *id.* at Ex. D.2 (Wyndham Grand Clearwater Beach), *id.* at Ex. D.3 (Wyndham

Garden Lake Buena Vista), *id.* at Ex. D.5 (Wyndham Grand Westward Look), *id.* at Ex. D.4 (Wyndham Grand Rio Mar); *see also* Ex. 5 (Bowen Report) ¶ 24.

Like the "press releases," "marketing brochures," and media publications the court considered to be sources of consumer knowledge in *Marcus*, all of the sources described above show that "the allegedly omitted information" regarding resort fees "was available to class members." *Marcus*, 687 F.3d at 589, 611. Even before they arrived at Wyndham's Websites, class members had the opportunity to learn about resort fees from OTA websites, travel guides, and other channels. Then once they arrived at the Websites, class members saw the specific resort fee amount they would be charged and, consistent with FTC guidance, were presented with a prominent and bolded "Total for Stay" amount that also included the resort fee. In light of all these disclosures, plaintiff cannot meet his burden of "demonstrat[ing] by a preponderance of the evidence" that information about resort fees was "not knowable to a significant number of class members." *Abraham*, 321 F.R.D. at 191; *Marcus*, 687 F.3d at 611.

2.   Plaintiff Has Not Proven That Class Members Reacted Uniformly To Information About Resort Fees.

Given that resort fees were "knowable," individual questions related to causation will predominate unless plaintiff can prove that "class members were nonetheless relatively uniform in their decisionmaking." *Marcus*, 687 F.3d at 611. Plaintiff has not done so. This second prong of *Marcus* requires plaintiff to show that "at most, only an insignificant number of class members actually knew" about resort fees but chose to book a room anyway. *Id.* Put otherwise, if a "significant number of class members" knew about resort fees but still chose to book, plaintiff cannot invoke a presumption of causation because the class necessarily would include a significant number of people with no viable CFA claim. *See id.* Here, the evidence shows that many consumers with actual knowledge of resort fees do go on to book a room on the Websites. As in

*Marcus*, some of them might have viewed the resort fees as a fair "trade-off" in light of the amenities covered, while "[o]thers may simply have had the means" to stay at the hotel of their choice and "brush off" the fees. *Id.* at 612.  Whatever the reason, the presence of these individuals in the class precludes applying a presumption of causation and thus precludes class certification.

Survey evidence indicates that consumers with actual knowledge of resort fees book in significant numbers.  Dr. Itamar Simonson of Stanford University surveyed approximately 500 likely hotel consumers ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

These results ████████████████████████████████████████████████

████████████████████████████████, and confirm that many consumers who know they will be

charged a resort fee still go on to book anyway. ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████ Under *Marcus*,

consumers like these who choose to book with knowledge of resort fees preclude a class-wide

finding of causation.  *See* 687 F.3d at 611 ("The evidence might suggest that a significant number of class members could have known of the alleged 'defects,' but decided to purchase or lease their cars at the same price anyway.").

Dr. Simonson's findings are also in line with microeconomic theory in these circumstances. As economist Dr. John Johnson explains, every consumer ascribes a value to a product that he or she considers purchasing, called a "willingness to pay."  Ex. 24 (Johnson Report) ¶ 17.  This value, which varies across consumers, is based on "each consumer's preferences, budget, available alternatives, and state of mind at the time of purchase."  *Id.*  A consumer purchases a product if the willingness to pay exceeds the market price.  *Id.* ¶ 24.  Here, some consumers with knowledge of resort fees likely still booked at a Wyndham-affiliated property because their individual willingness to pay exceeded the total price for a room, including the resort fee.  But identifying which class members fit this description requires individualized inquiries because both willingness to pay and the total price for a room vary substantially across the class, *id.*, meaning that class members were not "relatively uniform in their decisionmaking" of whether to pay a resort fee. *Marcus*, 687 F.3d at 611.

Indeed, plaintiff cannot possibly show uniform decisionmaking in this case, given that his proposed class covers more than 30 hotels in different geographic regions and different pricing segments, each offering its own set of unique amenities. As a matter of both common sense and economic theory, it is simply implausible to believe that class members made uniform choices about whether to pay a resort fee at all of these different hotels.  Some properties, such as the Wyndham Grand Orlando Bonnet Creek and the Wyndham Lake Buena Vista, are located in key leisure travel markets near popular regional attractions and offer amenities geared toward families and leisure travelers.  Others, such as the Wyndham New Yorker and the Hotel Henri, are located

in urban centers that cater to business and city travelers.  Each market attracts different sets of consumers with different budgets and travel needs, and consumers staying at those hotels will not be relatively uniform in their willingness to pay a resort fee.  *See* Johnson Report ¶¶ 33, 47.

Perhaps even more significantly, price points for a room vary across hotels, and consumers do not have a "uniform" response to those varying prices.  Resort fees at hotels that define the class ranged from $28 to $12 to as low as $2.  *See* Ex. 2 (Resps.) at Ex. A; Ex. 4 (WYN00237020).  Moreover, average nightly room rates varied significantly across the hotels in the class.  *See* Ex. 2 (Resps.) at 1.  Even at the same property, room rates changed frequently (often on a daily basis), Ex. 25 (Kukulski Dep.) 86:7-12, with further variation based on the size and type of room to be reserved, *e.g.*, Ex. 26 (TL00251).  While a high-end property like the Shelborne may have commanded a base room rate of $359 per night for a standard room on a holiday weekend, Ex. 14 at TL00005, a Days Inn property might have charged only a fraction of that, Ex. 2 (Resps.) at 1, particularly during the off-season.  These variations resulted in different purchase decisions across consumers, who had different levels of willingness to pay.  Consumers are thus not "relatively uniform" in their decisions about whether to pay a total price that includes resort fees, given that the amount of the resort fee varies across properties and those fees are added to a nightly room rate that itself varies by property, room type, and time of year.

Finally, the unique competitive environment in which each hotel is located also means that consumers will not be uniform in their decisionmaking about whether to pay a resort fee.  Specifically, consumers will be impacted by whether other hotels in the same area with the same level of service and amenities also charge a resort fee.  If most or all of a given hotel's competitors charge resort fees—as is true with the Wyndham Grand Orlando Bonnet Creek, Wyndham Grand Clearwater Beach, and Wyndham Grand Jupiter, among others, *see, e.g.*, Exs. 27

(WYN00073071), 28 (WYN00073183) (███████████████)—that would impact willingness to pay across the market.  *See* Ex. 24 (Johnson) Report ¶ 47.  As a result, consumers might make different choices about whether to pay a total price that includes a resort fee.

For these reasons, plaintiff cannot meet his burden of invoking a class-wide presumption of causation because class members were not uniform in their decisionmaking.  *Marcus*, 687 F.3d at 611.  The class is made up of consumers who stayed at different hotels in different locations with different amenities and price points.  At least some of those consumers had a sufficiently high willingness to pay that they chose to book a room with knowledge of the resort fees they would be charged.  Those consumers have no CFA claim because they cannot establish a causal link between Wyndham's alleged misconduct and their purported loss.  Given all of the variations across class members, those who booked with knowledge of the resort fee cannot be identified through a common inquiry, and that creates a predominance problem that precludes class certification.

### B. Plaintiff Has No Viable Theory Of Class-Wide Ascertainable Loss.

Plaintiff's class allegations also fail because he has identified no viable theory of ascertainable loss that is amenable to class-wide proof.  *Harnish*, 833 F.3d at 306.  As the Third Circuit has explained, it is "entirely appropriate" at the class certification stage "to examine the plaintiffs' theory of damages and the proof supporting it" in order to determine whether the plaintiff can "demonstrate the fact of damage—'ascertainable loss' and a 'causal relationship'— class-wide."  *Id.*  Like the plaintiffs in *Harnish*, plaintiff here has "failed to propose a cognizable theory of damages that is sufficiently supported by class-wide evidence."  *Id.* at 313.  Plaintiff's damages theory has shifted repeatedly throughout this litigation and remains a moving target.  But although plaintiff has offered four different theories at various times, none of those theories provides the common proof of ascertainable loss necessary to satisfy the predominance requirement of Rule 23(b)(3).  *See, e.g., id.* at 305-06; *see also Abraham*, 321 F.R.D. at 174.

*First*, in his pending class certification motion, plaintiff advances a theory of ascertainable loss based on defeated expectations regarding the cost of Wyndham hotel rooms.  Plaintiff claims the class expected to pay only the base room rate (plus government taxes) but were purportedly charged more than expected in the form of resort fees.  *See* Pl.'s Br. at 8.  This class-wide theory of ascertainable loss is unworkable because it incorrectly assumes that all class members had the same expectations and that those expectations were defeated in the same way.  *See* Johnson Report ¶¶ 19-24.  As the court explained in *Marcus*, "what a class member expected of [the product] depends on what information, if any, about the alleged defects was available during the class period and whether that class member knew about it."  *Marcus*, 687 F.3d at 607.  The record here makes clear that not all consumers shared the purportedly common expectation plaintiff puts forth; at least some class members knew about resort fees and still chose to book.  *See supra* at I.A.2.  These consumers have suffered no loss under plaintiff's expectation theory because there is no difference between the price they believed they would pay and the price they ultimately paid.  But assessing whether any given class member expected to pay resort fees cannot be established with common evidence and requires an individualized inquiry that precludes class certification.

Indeed, plaintiff's expert Dr. Morwitz conceded that ██████████████████████████ ████████████████████████████████████████████████ Ex. 29 (Morwitz Dep.) 33:22-34:1 ███████████████████████████████████████████████████████████ ████████████████████████████████████████████ Moreover, she could not ███████████████████████████████████████████████████████████ ██████████████████ *Id.* at 190:17-24 ███████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████



███████████████████████████████████████ She also confirmed that ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ *Id.* at 185:14-21 ██████████████████████

████████████████████████████████████████████████████████████

████████. This testimony confirms what the Third Circuit explained in *Marcus*: consumer

expectations about a product are highly individualized and cannot be determined on a class-wide

basis. *See* 687 F.3d at 607.

    *Second*, through his expert Dr. Morwitz, plaintiff argues that ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ Morwitz Report ¶ 72.  But

plaintiff has offered no evidence that Mr. Luca or even a single class member—let alone the class

as a whole—████████████████████████████████████████████████████

████████████████████████████████████████████████. *See* Johnson Report

¶¶ 26-31.  Dr. Morwitz confirmed that she ██████████████████████████████████

████████████████████████████████████ *E.g.*, Ex. 29 (Morwitz Dep) 39:12-17 ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ The failure of class-wide proof dooms this theory of

ascertainable loss.

    But even if this theory were amenable to class-wide proof, it also fails because it is not a

legally cognizable theory of ascertainable loss under the CFA.  Plaintiff's position that class

members suffered damages because they were induced to "rent a more expensive room than they

otherwise would" amounts to a species of price inflation, whereby Wyndham's alleged misconduct purportedly allowed it to charge higher prices across the class.  But it is well established that price inflation is not a cognizable theory of ascertainable loss under the CFA.  *See Harnish*, 833 F.3d at 312 (explaining that New Jersey courts have "refused to recognize" price inflation outside securities fraud context); *Dugan v. TGI Fridays, Inc.*, 171 A.3d 620, 641 (N.J. 2017) ("[Plaintiffs] cannot establish ascertainable loss … by demonstrating that [defendant's] beverage prices were higher than they would have been had [defendant] listed its prices on its restaurant menus."); *N.J. Citizen Action v. Schering-Plough Corp.*, 842 A.2d 174, 178 (N.J. App. Div. 2003) (explaining that price inflation has "no place as a part of the proofs required of plaintiffs in the CFA context").

*Third*, plaintiff and Dr. Morwitz argue that all class members experienced "increased search costs" as a result of Wyndham's resort fee practices, meaning that they had to spend additional time and effort to compare hotels.  Pl.'s Br. at 2 n.1; Morwitz Report ¶¶ 46-47.  However, neither plaintiff nor Dr. Morwitz provide any basis for quantifying the damages that purportedly arise from these "increased search costs," and they therefore cannot serve as proof of ascertainable loss.  *See Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 793 (N.J. 2005) ("The certainty implicit in the concept of an 'ascertainable' loss is that it is quantifiable or measurable."); Ex. 29 (Morwitz Dep.) 70:24-71:2 ████████████████████████████ ████████████████████████████████████████████

*Finally*, at the motion-to-dismiss stage, plaintiff put forth a theory of ascertainable loss based on a different theory of expectation damages.  There, plaintiff argued that his ascertainable loss was the $7 difference between the amount he expected to pay based on the Total for Stay quoted to him on the Websites and the amount he actually paid at the Shelborne.  That $7 charge represented the taxes on the resort fee which the website did not properly calculate, but which were

properly calculated on his final folio. *See* Pl.'s Opp'n to Mot. to Dismiss (ECF No. 23) at 4. The problem with this theory is that the $7 difference was due to a technical problem with the Websites that lasted approximately four months and affected only a single property, the Shelborne, out of more than 30 properties that define the class here. *See* Ex. 17 (Krul 30(b)(6) Dep.) 97:9-98:13. Since this glitch did not impact all (or even most) members of the class, it cannot provide a class-wide basis for ascertainable loss.

## II.   THE PROPOSED CFA CLASS DOES NOT SATISFY THE COMMONALITY OR TYPICALITY REQUIREMENTS OF RULE 23(a).

Plaintiff's proposed CFA class is also improper because it does not satisfy the Rule 23(a) requirements of commonality and typicality.

*Commonality.* The commonality requirement is "easy to misread, since any competently crafted class complaint literally raises common questions." *Mielo v. Steak 'n Shake*, 897 F.3d 467, 487 (3d Cir. 2018). But the "mere recital of questions that happen to be shared by class members is not sufficient to obtain class certification"; instead, a plaintiff must "demonstrate that the class members have suffered the same injury." *Id.* Mr. Luca has not made this requisite showing.

Mr. Luca contends that Wyndham's purported misconduct "can be determined in one stroke for all class members" because "[t]he RF Hotels prominently advertised Room Rates on the Websites in exactly the same manner." Pl.'s Br. at 8. But this claim ignores substantial differences among class members who accessed the Websites at different times during the class period. Wyndham redesigned its booking website in 2012 and again in 2016, and the location and form of the resort fee disclosures changed with each of these redesigns. *See* Ex. 2 (Resps.) at 3-5. The proposed class thus includes consumers who viewed at least three materially different versions of the Websites, not to mention various mobile and tablet versions that had their own respective designs and layouts over time. *See id.* Contrary to Mr. Luca's rhetoric, class members across

these different iterations thus did not experience the booking flow "in exactly the same manner," Pl.'s Br. at 8, and have not suffered the same injury (if any).  *See, e.g.*, *Dilley v. Acad. Credit, LLC*, 2008 WL 4527053, at *5 (D. Utah Sept. 29, 2008) (denying class certification because "the website Plaintiff viewed was not the same website viewed by all the purported class members"); *Hillis v. Equifax Consumer Servs.*, 237 F.R.D. 491, 504 (N.D. Ga. 2006).

  ***Typicality.***  The typicality requirement is "designed to screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class."  *Ctr. City Periodontists, P.C. v. Dentsply Int'l*, 321 F.R.D. 193, 206 (E.D. Pa. 2017). To that end, courts address whether (1) the class representative's claims are "generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory" and (2) whether the class representative is subject to a unique defense that is "likely to become a major focus of the litigation."  *Id.*  Mr. Luca fails at both steps of this inquiry.

  The factual circumstances of Mr. Luca's claim are not "generally the same" as the rest of the class.  *Id.*  For one thing, the class includes consumers who stayed at different brands and hotels, including limited-service economy hotels with rates much lower than what Mr. Luca paid at the Shelborne, such as Super 8 or Days Inn properties.  *See* Ex. 2 (Resps.) at 2.  These properties operate in different market segments and attract consumers with different preferences.  *See* Ex. 24 (Johnson Report) ¶¶ 32-47.  Mr. Luca has not shown that his experience—paying a $25 resort fee on a $359 room rate at a top-tier Wyndham Grand in Miami Beach with substantial amenities—is similar to that of class members who may have paid a $2 or $3 resort fee on a much lower room rate at the Ramada in Lakeland, Florida or the Wyndham in Virginia Beach.  *See* Ex. 2 (Resps.) at 2-3 & Ex. A.  Under Dr. Morwitz's theory of "drip pricing," ███████████████████████████ ████████████████████████████████████ Morwitz Report ¶ 66.  But even assuming that

a "drip pricing" theory is viable here, Mr. Luca has not shown that his experience at the Wyndham Grand is typical of the broader class that includes other brands, given the variation in room rates and resort fees across those brands. Indeed, the record contains very little evidence at all on those other brands because Mr. Luca consistently focused his case on the Wyndham brands. He never built a class certification record for the non-Wyndham brands, but is now trying to expand the class to include them at the eleventh hour.

Finally, Mr. Luca's stated willingness to pay more for his room at the Shelborne implicates a unique defense to his CFA claim that creates further typicality problems. Under the CFA, Mr. Luca cannot recover unless he changed his conduct based on Wyndham's alleged misrepresentations. *See, e.g.*, *Rudel Corp. v. Heartland Payment Sys., Inc.*, 2016 WL 4472944, at *5 (D.N.J. Aug. 23, 2016) (dismissing CFA claim because plaintiff "did not apparently change its conduct in any way because of the promise"); *Kendall v. CubeSmart, L.P.*, 2016 WL 1597245, at *12 (D.N.J. Apr. 21, 2016). Here, Mr. Luca testified that he "was going to book a room at [the Shelborne] no matter what it cost" and was explicit that he would have stayed at the Shelborne even if the room rate were $384 per night with no resort fee (as opposed to the $359 rate he paid in addition to a $25 resort fee, which totals the same $384). Ex. 13 (Luca Dep.) at 147:3-20. Indeed, he went on to volunteer that even "[i]f it would have been $400, I would have booked the room." *Id.* at 147:19-20. This testimony jeopardizes Mr. Luca's CFA claim because it makes clear that Wyndham's resort fee disclosures had no impact on his booking decision. Like the plaintiffs in *Rudel* and *Kendall*, Mr. Luca would have incurred the same total costs even if Wyndham had complied with his view of the law, and that precludes his recovery.

## III.   THE PROPOSED TCCWNA CLASS CANNOT BE CERTIFIED.

To recover under the TCCWNA, a plaintiff must have statutory standing to sue as an "aggrieved consumer." *Spade v. Select Comfort Corp.*, 181 A.3d 969, 976 (N.J. 2018); *Dugan   v.*

*TGI Fridays, Inc.*, 171 A.3d 648-49 (N.J. 2017); N.J.S.A. 56:12-15, -17.   An "aggrieved consumer," in turn, is one who "has suffered harm as a result of the defendant's inclusion of prohibited language in a contract."  *Spade*, 181 A.3d at 980.  Here, individualized inquiries are necessary to determine whether potential class members suffered any harm as a result of Wyndham's purported violation of the TCCWNA, or whether they were "merely … exposed to unlawful language in a contract or writing, to no effect."  *Id.* at 979-80.  Mr. Luca has put forth no common evidence showing that all class members were harmed by the purportedly unlawful provisions of the Websites' terms of use, much less that they were harmed in the same way.  Whether any given class member "suffered harm as a result of" the terms of use requires an individualized inquiry, making plaintiff's TCCWNA claim unsuitable for class-wide adjudication.

The proposed TCCWNA class also cannot be certified because Mr. Luca has no common evidence that all class members even received a copy of the Websites' terms of use to begin with.  In *Dugan*, the New Jersey Supreme Court held that an individual must, "at a minimum, prove that he or she received" the allegedly unlawful contract to qualify as an aggrieved consumer.  171 A.3d at 649.  *Dugan* rejected the named plaintiff's efforts to certify a class because there was no common evidence that each class member actually received the document at issue.  *Id.*  Rather, "individual questions would predominate over common issues," *id.*, because "the testimony of the individual claimant or another witness would be necessary to prove that the plaintiff" received the document "and is thus an 'aggrieved consumer,'" *id.* at 648.

This case, too, is inappropriate for class certification because, as in *Dugan*, individualized inquiries are necessary to determine whether any given class member received the document at issue.  Although Mr. Luca claims that "every Class Member … was bound to the illegal Terms of Use," Pl.'s Br. at 13, those terms were not displayed as part of the booking flow that he

24

encountered.  In order to access the terms, Mr. Luca (and each member of the putative class) would have had to click a separate link at the bottom of the booking flow.  While some consumers may have clicked the link and received a copy of the terms of use, Mr. Luca has no common evidence to prove that all class members did so.  *See Dugan*, 171 A.3d at 648.  He therefore lacks evidence of what *Dugan* called "the critical interaction between any single member of the putative class and the allegedly offending" contract terms, and he cannot certify a TCCWNA class without it.  *Id.*[5]

Mr. Luca's own testimony also confirms that he has no valid individual TCCWNA claim and therefore cannot represent the TCCWNA class.  Mr. Luca testified that he had never seen the terms of use prior to his deposition in this case.  *See* Ex. 13 (Luca Dep.) 194:23-25 ("Q. Have you ever seen this document before?  A. I don't believe so.").  When asked specifically whether he had seen those terms as he moved through the booking flow, Mr. Luca indicated: "I don't ever remember seeing this come up.  I['ve] never seen this before."  *Id.* at 195:13-18.  Because Mr. Luca never received a copy of the terms of use he purports to challenge (and thus cannot have been harmed by them), he cannot be an "aggrieved consumer" under *Spade* and *Dugan*.  And because he has no valid TCCWNA claim of his own, he cannot represent a class of TCCWNA claimants.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiff's motion for class certification based on the parties' written submissions.  However, at the very least, Wyndham respectfully submits that the Court cannot grant plaintiff's motion for class certification without an evidentiary hearing in light of the issues presented here.

---

[5] The fact that all class members clicked a checkbox agreeing to be bound by the terms of use does not change this conclusion.  A class member's decision to agree to the terms, sight unseen, renders those terms enforceable.  *See, e.g.*, *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 238 (E.D. Pa. 2007).  But it has no bearing on whether a given class member actually received a copy of the allegedly offending contract.  *See Dugan*, 171 A.3d at 649.

Dated: December 14, 2018

David A. Strassburger (Pa. I.D. No. 76027)
STRASSBURGER MCKENNA
  GUTNICK & GEFSKY
444 Liberty Avenue, Suite 2200
Pittsburgh, PA  15222
Telephone: (412) 281-5423
Facsimile: (412) 281-8264
dstrassburger@smgglaw.com

Respectfully submitted,

*/s/ K. Winn Allen*
K. Winn Allen
Ronald K. Anguas, Jr.
Zachary A. Avallone
KIRKLAND & ELLIS LLP
655 Fifteenth Street NW
Washington, DC  20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
winn.allen@kirkland.com

*Counsel for Defendants Wyndham Hotel Group, LLC, and Wyndham Hotels and Resorts, LLC*

**CERTIFICATE OF SERVICE**

I certify that on December 14, 2018, I electronically filed a redacted copy of the foregoing with the Clerk of this Court by using the CM/ECF system, which will accomplish service through the Notice of Electronic Filing for parties and attorneys who are Filing Users.  I also certify that on December 14, 2018, I served plaintiff's counsel of record with an unredacted copy of the foregoing filing and filed the same with the Clerk of the Court pursuant to this Court's Local Rules and procedures.

*/s/ K. Winn Allen*

K. Winn Allen
Counsel for Defendants